Case 4:12-cv-02917 Document 12-1 Filed in TXSD on 12/18/12 Page 1 of 20

# Exhibit A

Case 4:12-cv-02917 Document 12-1 Filed in TXSD on 12/18/12 Page 1 of 20

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| WILLIAM ROBERTS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CASE NO.  4:12-CV-02917 |
| VS. | § | |
| | § | |
| WRIGHT MEDICAL TECHNOLOGY, INC., | § | |
| a Delaware corporation; and WRIGHT | § | |
| MEDICAL GROUP, INC., a Delaware | § | |
| corporation, | § | **JURY TRIAL DEMANDED** |
| | § | |
| Defendants. | § | |

**FIRST AMENDED COMPLAINT**

Plaintiff WILLIAM ROBERTS, by his undersigned attorneys, sues the Defendants, WRIGHT

MEDICAL TECHNOLOGY, INC. and WRIGHT MEDICAL GROUP, INC., and alleges:

## I.  PARTIES

1.      At all times material to this cause, Plaintiff WILLIAM ROBERTS was a citizen and

resident of Houston, Harris County, Texas.

2.      Defendant Wright Medical Technology, Inc. (hereinafter "Wright Technology") is a

corporation organized under laws of the State of Delaware, with its principal place of business

located in Arlington, Tennessee, and as such is a citizen of both the State of Tennessee and the

State of Delaware.  Defendant Wright Technology is registered to do business in the State of

Texas, and may be served with process by serving its registered agent for service, Corporation

Service Company, at Corporation Service Company D/B/A CSC-Lawyers Incorporating Service

Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

3.      Defendant Wright Medical Group, Inc. (hereinafter "Wright Group") is a corporation

organized under the laws of the State of Delaware, with its headquarters and principal place of

business located in Arlington, Tennessee, and as such is a citizen of both the State of Tennessee

Case 4:12-cv-02917 Document 12-1 Filed in TXSD on 12/18/12 Page 3 of 20

and the State of Delaware. Defendant Wright Group is authorized to do business in Tennessee; and may be served with process by serving its registered agent for service, Corporation Service Company, at 2908 Poston Avenue, Nashville, TN 37203-1312.

4. At all relevant times, Defendant Wright Medical Group, Inc. was engaged in the business of designing, manufacturing, testing, labeling, marketing, distributing, and selling, either directly or indirectly through third parties or related entitles, numerous prosthetic orthopedic products, including the Wright Medical ProFemur Total Hip System.

5. At all relevant times, Defendant Wright Medical Technology, Inc. was engaged in the business of designing, manufacturing, testing, labeling, marketing, distributing, and selling, either directly or indirectly through third parties or related entities, numerous prosthetic orthopedic products, including the Wright Medical ProFemur Total Hip System.

6. At all relevant times, as the parent corporation of Wright Medical Technology, inc., Wright Medical Group, Inc. was engaged in the business of designing, manufacturing, testing, labeling, marketing, distributing, and selling, either directly or indirectly through third parties or related entities, numerous prosthetic orthopedic products, including the Wright Medical ProFemur Total Hip System, as well as monitoring and reporting adverse events, and having a role in the design process and response of the Defendant, Wright, if any, to these adverse events.

7. Defendants Wright Medical Group, Inc. and Wright Medical Technology, Inc. are collectively referred to as Defendants, "Wright" or "Defendants Wright". At all relevant times, each of the Defendants Wright was a representative, agent, employee, servant, employee, partner, joint-venturer, franchisee, or alter ego of the other Defendant Wright and was acting within the scope of its respective authority of the other Defendant Wright by virtue of this interrelationship.

## II. JURISDICTION AND VENUE

8.      This Court possesses diversity jurisdiction pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs, as this action involves a products liability claim by a severely injured party. There is complete diversity of citizenship between the parties.

9.      Defendants are subject to the Court's personal jurisdiction because at all relevant times hereto, Defendants transacted business and continues to transact business in the State of Texas.  Defendants have sufficient minimum contacts with Texas such that exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice.

10.      Defendants are corporations, thus they are deemed to reside in any judicial district in which they are subject to the personal jurisdiction.  28 U.S.C. § 1391(c).  As Defendants are subject to personal jurisdiction in Texas, venue is proper in this Court. 28 U.S.C. § 1391(a)(1).

11.      At all times relevant hereto, Defendants developed, manufactured, advertised, promoted, marketed, sold, and/or distributed the defective Wright ProFemur Total Hip System throughout the United States.

## III. FACTUAL BACKGROUND

### Plaintiff's Injury

12.      This case arises from personal injuries suffered by the Plaintiff William Roberts as the result of a defective Wright ProFemur Total Hip System ("ProFemur System" or "the Device") which was designed, manufactured, tested, labeled, marketed, distributed and/or sold by the Defendants Wright.

13.      On or about August 11, 2005, William Roberts underwent a left total hip arthroplasty at St. Luke's Episcopal Health System in Houston, Texas, performed by Glenn C. Landon, MD.

14. During the procedure, Plaintiff was implanted with a Wright ProFemur Total Hip System which included a Wright ProFemur modular femoral neck, Lot Number U12116225.

15. On or about October 21, 2010, while Plaintiff was standing, the ProFemur modular femoral neck that was implanted in Plaintiff, suddenly failed, gave way, and fractured, causing Plaintiff to fall in excruciating pain, and thus, causing him to fracture the fifth metacarpal shaft of his right hand.

16. On or about October 28, 2010, Plaintiff underwent revision surgery at Morriston Hospital in Swansea, Wales by D. J. Woodnutt, MD, including removal of the fractured fragments of the Profemur modular femoral neck.

17. As the direct result of the failure of the Wright ProFemur modular femoral neck, Plaintiff suffered severe physical and mental pain and anguish, disability and inconvenience, incurred substantial hospital, medical and rehabilitation expenses, loss of ability to work, and loss of ability to enjoy life, and will continue to suffer these losses in the future.

18. Plaintiff, in the exercise of due diligence, could not have reasonably discovered the cause of his injuries including but not limited to, the defective design and/or manufacturing of the Device implanted inside of him until he underwent revision surgery on October 28, 2010.

### The Product

19. The Wright ProFemur Total Hip System that was implanted into Plaintiff and was designed and manufactured by Defendants Wright is a pre-amendment Class III medical device because the ball and socket are made of metal. Like all Class III metal-on-metal hip systems, the device has been "grandfathered" and bypass FDA's rigorous Pre-Market Approval process. ProFemur Total Hip Systems incorporate different ball and socket combinations, and all gain entry to the marketplace through the Class II 510(k) process.

20.     Under the 510(k) process, a manufacturer does not need Premarket Approval from the FDA in order to sell its medical device to the public; rather it must provide Premarket Notification that allows the FDA to "clear" rather than approve the device on the basis of substantial equivalence to a "predicate device."

21.     Unlike post-amendment Class III medical devices, which are designated as high risk, such as an artificial heart that reaches the market only through a Premarket Approval ("PMA") process, pre-amendment Class III devices do not require "approval" by the FDA.   Whereas post-amendment Class III devices cannot be sold unless the manufacturer demonstrates to the FDA, through adequate and well-controlled clinical trials, that the proposed device is safe and effective, there is no such requirement for Class II devices or pre-amendment Class III devices.   The "premarket notification" or 510(k) process for Class II or pre-amendment Class III devices is not focused on whether the device is safe and effective, but rather whether the proposed device is substantially equivalent to an existing predicate device that was already cleared for marketing by the FDA.

22.     On or about September 26, 2000, Defendants Wright submitted a 510(k) application to the U.S. Food & Drug Administration for clearance of its uncemented ProFemur R Revision Hip System which was indicated for total hip replacements.

23.     On or about December 13, 2000, the FDA cleared Defendant's ProFemur Total Hip System for marketing in the United States based upon its substantial equivalency of prior similar hip systems.

24.     The ProFemur system is comprised of three separate components which are assembled together during surgery: a femoral head, a modular neck, and a femoral stem.   The advantage of this system is that various sizes and configurations of the head, neck and stem are available, and the modular three-piece system allows the operating surgeon to customize the prosthesis to best suit the unique anatomy of each patient.

25. In the instant case, the modular neck used in Plaintiff fractured and broke below the level of taper. The fracture of the modular neck caused failure of the system, requiring corrective surgery, and made it extremely difficult to remove the broken segment.

26. As with all femoral implants, fatigue strength performance is influenced by amount of offset, amount of version and, in the case of modular neck implants, taper design geometry.

27. A major drawback for all modular orthopedic devices is that each modular component interface becomes a potential site for corrosion, wear, fretting (which is a wear mechanism that occurs at low amplitude between two mechanically joined parts under load), and fatigue of mating surfaces. Thus, to make implant designs successful in clinical applications, these concerns need to be adequately addressed during the design stage of the prosthesis in conjunction with the implant strength and integrity of the implant-host bone system.

28. There is a variety of design and material factors that may influence the failure of a specific component, the most significant of which is fretting because it is almost impossible to prevent and in many cases leads to failure of the device. The concern about fretting is ever increasing because orthopedic surgeons and implant companies are interested in implants with more areas of modularity, which in turn means the presence of more mechanical joints, thereby dramatically markedly increasing the possibility of fretting damage.

29. Among the factors that promote fretting are the design characteristics of modular hip implants such as neck diameter, neck length, the material with which the neck is made, the method of assembly required, and fabrication tolerances of the joined parts.

30. Studies have shown that modular neck adapters made from titanium ally, such as the ProFemur modular neck adapter implanted into Plaintiff, are more likely to suffer fretting corrosion and fatigue fracture than those made from cobalt-chromium.

31. Studies have also shown that the longer the neck, the more likely it is to fracture.

32. Studies have also shown that the method of assembly of the modular components is crucial.

33. In 2009, after Plaintiff was implanted with his ProFemur Total Hip System, Defendants changed the material of their ProFemur Hip System modular necks from titanium to cobalt chrome alloy. Their 510(k) for that product change was submitted to the FDA on or about April 16, 2009 and was cleared for marketing on August 25, 2009.

34. Despite Defendants' change in materials for the modular neck, Defendants implemented no corrective action in the form of a recall or even an announcement or warning to the medical community or to the public at large concerning its decision to switch from titanium modular neck adapters to cobalt chrome adapters.

35. At all times material to this cause, Defendants Wright were aware, or should have been aware, of the danger of fatigue fracture and failure risks inherent in the titanium ProFemur modular femoral neck adapters generally, despite the fact that these products were "cleared" for marketing by the FDA.

### Factual Allegations Common to All Counts

36. Defendants' ProFemur Modular Total Hip System (the "Device") was intended to be used as a hip replacement for treatment of serious hip fractures or osteoarthritic hip conditions. Despite claims that this Device was safe and effective as a hip replacement, emerging scientific evidence suggests that the titanium used in the system was subject to fretting from micromotions within the modular tapered neck connection to the femoral stem, and that the surface cracks caused by fretting or fretting corrosion lead to fatigue fractures of the titanium alloy modular neck adapters.

37. At all relevant times, Defendants knew, or should have known, that the Device which included a titanium modular femoral neck was more prone to fatigue fracture and failure than a device made with a cobalt chromium modular neck.

38. At all relevant times, Defendants knew, or should have known, that the length of the titanium modular neck in their Device was a factor to consider regarding possible fracture, and that the longer the modular neck, the more prone it was to fatigue fracture.

39. At all relevant times, Defendants' Device was marketed to the medical community and to patients as safe, effective, and reliable medical devices; and safer and more effective than traditional products or other competing hip replacement devices.

40. At all relevant times, Defendants marketed and sold its Device to the medical community and to patients via carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies included aggressive marketing to health care providers which touted Defendants' Device to be less invasive and more effective than the competing devices.

41. Contrary to the Defendants' representations to the medical community and to the patients themselves, Defendants' ProFemur Modular Total Hip System with its titanium modular neck adapter was defective, in that it had an unreasonably high failure rate, presenting hip fracture and severe injury to the patient, which required painful corrective surgery and a prolonged recovery time. Defendants have consistently underreported and withheld information as to the propensity of the Device to fail, has intentionally misled the FDA by underreporting adverse event reports and withholding information showing the propensity of the Device to fail, and has intentionally misrepresented the efficacy and safety of the Device to the medical community, patients and the public at large.

42. At all relevant times, Defendants knew, and continue to know, that some of the predicate products for the Device had high failure and complication rates; and/or that there were and are differences between the Defendants' Device and some or all of the predicate products,

rendering them unsuitable for designation as predicate products; that the Defendants' representations to the FDA were and are incomplete and misleading as to significant differences between the Device and its predecessor and predicate products and that the Device was and is causing numerous patient injuries and complications. The Defendants suppressed this information, and failed to accurately and completely disseminate or share this and other critical information with the FDA, health care providers, or to patients. The Defendants actively and intentionally misled and continue to mislead the public, including the medical community, and its patients, into believing that the Device and the procedures for the implantation were safe and effective in order to induce health care providers and patients to prescribe, implant and/or use the Defendants' Device.

43. Defendants improperly designed the ProFemur Modular Total Hip System and failed to perform or rely upon proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Device before and after it was placed on the market.

44. Further, Defendants failed to design and implement adequate assembly procedures for the modular components of the Device.

45. In addition, Defendants misrepresented to the FDA, the medical community, and to the public at large including Plaintiff that the Device had been properly designed and tested and was found to be safe and effective for its use as a viable hip replacement.

46. Defendants also failed to design and establish a safe, effective procedure for removal of the Device in the event of failure, causing the Device to be impossible or extremely difficult, to be safely removed from the body once implanted.

47. At all relevant times, feasible and suitable alternative total hip system Devices existed.

48. Defendants' Device was at all times utilized and implanted in a manner foreseeable to the Defendants, as Defendants generated the instructions for use and created the procedure for implanting physicians.

-10-

49.     At all relevant times, Defendants provided incomplete, insufficient, and misleading training and information to the implanting physicians, in order to increase the number of physicians willing to choose Defendants' Device over an alternative device or procedure, in order to increase the sales of the Device, thereby causing the dissemination of inadequate and misleading information to be given to patients, including the Plaintiff.

50.     These misrepresentations were made by the Defendants with the intent of inducing the medical community to recommend, prescribe, purchase and implant the Device for hip replacement, all of which evinced an indifference to the health, safety and welfare of the Plaintiff.

51.     Defendants' Device that was implanted into Plaintiff was in the same or substantially similar condition as it was when it left the possession of Defendants, and in the condition directed by and expected by the Defendants.

52.     At all relevant times, Defendants misrepresented to, omitted and/or concealed from the Plaintiff and his implanting physicians the following material information:

      a.     That the Device was not as safe as other products and procedures available for a viable hip replacement in the Plaintiff;

      b.     That the risk of adverse events with the Device was higher than with other total hip replacement systems;

      c.     That the risk of adverse events with the Device was not adequately tested either before or after it was marketed;

      d.     That the limited clinical testing which was done, revealed that the Device had a higher risk of adverse effects that those associated with other hip replacement products and procedures available;

      e.     That Defendants failed to follow up on the adverse results from clinical studies and concealed, minimized, or misrepresented those findings;

f. That Defendants were aware of the dangers presented by the Device, including a high incidence of fatigue fracture and failure, and the need for revisionary surgery by the patient;

g. That patients who were implanted with the Device needed to be monitored closely for possible complications and/or failure of the Device;

h. That the procedure to remove any one of the failed modular components of Device had a high failure rate and/or would require excision of more bone and tissue from the patient, thereby reducing the success rate of revision surgery.

53. At all relevant times, Defendants had a duty when disseminating information to the public and to the medical community to disseminate truthful information; and a parallel duty not to deceive the FDA, the public or the Plaintiff, or his healthcare providers.

54. At all relevant times, Defendants had sole access to material facts concerning the defective design and/or nature of the Device and was under a duty to disclose to Plaintiff and his physicians the heightened risks of corrosion, fatigue fracture, failure and permanent injury caused by those defects.

55. At all relevant times, Defendants intentionally made material misrepresentations to the medical community and to the public, including the Plaintiff, regarding the safety of the Device; specifically that it was as safe or safer than other total hip replacement systems.

56. These representations, and others made by Defendants, were false when made and/or were made with pretense of actual knowledge, when such knowledge did not actually exist, and were made recklessly and without regard for the true facts.

57. Defendants' misrepresentations, and concealment and omissions of material facts concerning the risks of injury caused by the Device, were made to induce Plaintiff's physicians to

purchase, prescribe and implant the Device into the Plaintiff and/or to mislead Plaintiff into choosing that Device to replace his hip.

58.     At the time Plaintiff was implanted with the Device, neither he nor his implanting physicians were aware of the falsehood of Defendants' representations, and reasonably relied upon those representations, and Plaintiff was induced to using Defendants' device, causing him to suffer severe, permanent injuries.

59.     Had Plaintiff known the true facts about the dangers and serious health and safety risks of Defendants' Device, he would not have consented to having the Device implanted in him.

## IV.  COUNT I - STRICT LIABILITY

60.     Plaintiff incorporates by reference paragraphs 1 though 59 of this Complaint as though fully set forth herein.

61.     Defendants were the designers, manufacturers, marketers, sellers and/or distributors of the Device and its component parts, for use by ultimate consumers, including Plaintiff.

62.     Plaintiff purchased the Device and its component parts manufactured by Defendants.  The Device and its component parts were in their original packaging which was firmly sealed and in the condition existing at the time of their delivery by Defendants to its distributors and/or to Plaintiff's physician.

63.     Defendants designed, manufactured, marketed, sold, and/or distributed the Device and its component parts without substantial change in condition from when they left Defendants' control.

64.     The Device and its component parts were defective and unreasonably dangerous in that they failed and resulted in fractures of the modular neck of the Device, requiring patients to undergo revision surgeries.

65. The faulty design, marketing and/or manufacture of the Device and its component parts manufactured, produced and placed into the stream of commerce by Defendants were a producing cause of the injuries and damages to Plaintiff as more fully set forth below.

66. ***Marketing Design (Failure to Warn)***

    a. The risk that the Device could fracture and thus, fail, was a risk of harm that was inherent in the product, or that might arise from the intended or reasonably anticipated use of the product.

    b Defendants either actually knew, or reasonably should have foreseen, the aforesaid risk of harm at the time it marketed the Device.

    c Defendants failed to warn, or to adequately warn, of the aforesaid danger, or failed to give instructions, or adequate instructions, on how to avoid the danger.

    d The product was unreasonably dangerous as marketed because it was dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the knowledge common to the community as to its characteristics.

67. ***Design Defect***

    a. The design of the product rendered it unreasonably dangerous, taking into consideration the utility of the product and the risk involved in its use.

    b. There was a safer alternative design other than the one used that in reasonable probability:

        (i) would have prevented or significantly reduced the risk of fractures of the modular neck of the Device and/or failures of the Device that would not have impaired the products utility; and

       (ii)     that was economically and technologically feasible at the time the product left Defendants' control by the application of existing or reasonably achievable scientific knowledge.

68.    ***Manufacturing Defect***

    a.    The Device deviated, in its construction or quality, from its specifications or planned output in a manner that rendered it unreasonably dangerous.

    b.    The product was unreasonably dangerous as manufactured because it was dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the knowledge common to the community as to its characteristics.

    c.    The foregoing defects, more particularly described above, were a producing cause of Plaintiff's injuries and damages as more fully set forth below.

## V. COUNT II - NEGLIGENCE

69.    Plaintiff incorporates by reference paragraphs 1 through 68 of this Complaint as though fully set forth herein.

70.    At all relevant times, Defendants had a duty to individuals, including the Plaintiff, to use reasonable care in the design, manufacturing, testing, packaging, labeling, selling and distribution of the Device.

71.    Defendants were negligent in failing to use reasonable care in the design, manufacture, testing, packaging, labeling and selling of the Device in one or more of the following ways, among others:

    a.    in designing the Device and its component parts in a manner which caused them to fail and/or result in fractures of the Device.

    b.    in failing to adequately test the Device and its component parts.

c.      in failing to properly market the Device and its component parts.

d.      in failing to provide adequate warnings or information or both of the risks and hazards of the Device and its component parts.

72.      The design, manufacture, marketing and function of the Device and its component parts were within the exclusive control of Defendants.

73.      The Device and its component parts which were designed, produced and marketed by Defendants came into Plaintiff's possession in the same condition as they were in when they left the control of Defendants.

74.      The occurrence causing harm to Plaintiff, as described above, was one which in the ordinary course of events would not have occurred without negligence on the parts of Defendants. For these reasons, the doctrine of *res ipsa loquitur* permits a finder of fact to infer negligence on the part of Defendants.

75.      As a direct and proximate result of Defendants' negligence, Plaintiff was caused and in the future will be caused, to suffer severe personal injuries, pain and suffering, mental anguish, financial or economic loss, including but not limited to, obligations for medical services and expenses, present and future lost wages, and other damages as more fully set forth below.

## VI. COUNT III - PUNITIVE DAMAGES

76.      Plaintiff incorporates by reference paragraphs 1 through 75 of this Complaint as though fully set forth herein.

77.      The conduct of Defendants when viewed objectively from Defendants' standpoint at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to patients receiving hip implants, including the Plaintiff.

78.      Further, Defendants had actual, subjective awareness of the risk involved with respect to their conduct, but nevertheless proceeded with conscious indifference to the rights,

-16-

safety and welfare of others, including the Plaintiff. Defendants knew that there was a high probability that fractures of the Device's modular neck could occur and thus, failures of the Device could occur and would result in serious injury.

79.     The acts, omission, or both of Defendants that constituted gross negligence including one or more of the following, among others:

   a.   the Device was negligently manufactured in that it had an unreasonably high rate of fractures of the modular neck and failure causing patients, including Plaintiff, to undergo revision surgeries;

   b.   the Device was negligently designed in that it had an unreasonably high rate of fractures of the modular neck and failure causing patients, including Plaintiff, to undergo revision surgeries;

   c.   failing to perform or rely upon proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Device before and after it was placed on the market;

   d.   failing to design and implement adequate assembly procedures for the modular components of the Device;

   e.   failing to design and establish a safe, effective procedure for removal of the Device in the event of failure, causing the Device to be impossible or extremely difficult, to be safely removed from the body once implanted;

   f.   providing incomplete, insufficient, and misleading training and information to the implanting physicians, in order to increase the number of physicians willing to choose Defendants' Device over an alternative device or procedure, in order to increase the sales of the Device, thereby causing the dissemination of inadequate and misleading information to be given to patients, including the Plaintiff;

g.     failing to warn, or adequately warn, the consumer of the risk that the Device

had an unreasonably high failure rate, presenting hip fracture and severe

injury to the patient, which required corrective surgery and prolonged

recovery time.

80.    The above acts, omissions, or both, created a high probability of serious injury. There was a high probability that the Device's modular neck could fracture and thus cause a complete failure of the Device.  There was a high probability that such an occurrence or occurrences would result in severe injuries to the consumers of the Device, including Plaintiff.

81.    Defendants knew of the above risk, but nevertheless proceeded with conscious indifference to the rights, safety and welfare of consumer in general and Plaintiff specifically.

## VII.  COUNT IV - DAMAGES APPLICABLE TO ALL COUNTS

82.    Plaintiff incorporates by reference paragraphs 1 through 81 of this Complaint as though fully set forth herein.

83.    As a producing and proximate result of Defendants' Device and Defendants' conduct as described above, Plaintiff suffered in the past, and in reasonable medical probability will continue to suffer in the future, the following injuries and damages:

a.     physical pain, past and future;

b.     mental anguish, past and future;

c.     physical impairment, past and future;

d.     reasonable and necessary medical expenses, past and future;

e.     loss of earnings, earning capacity, or both, past and future;

f.     loss of the enjoyment of life, past and future; and

g.     other incidental damages.

## VIII.  COUNT V - JURY DEMAND

84.     Plaintiff hereby requests a trial by jury.

## IX.  COUNT VI - PRAYER

WHEREFORE, Plaintiff prays that Defendants be cited to appear and answer herein and

that, upon final trial, Plaintiff be awarded judgment against Defendants, jointly and severally:

(a)     for compensatory damages, jointly and severally, in excess of the minimum jurisdictional limits of this Court;

(b)     for punitive damages, severally, in excess of the minimum jurisdictional limits of this Court;

(c)     prejudgment interest;

(d)     post-judgment interest;

(e)     costs of Court; and

(f)     such other and further relief to which Plaintiff shows himself justly entitled to receive.

Respectfully submitted,


_/s/ Neeley G. Morgan_____
Charles R. Houssiere, III
Southern District ID No. 5202
State Bar No. 10050700
E-mail: choussi@hdhtex.com
Neeley G. Morgan
Southern District ID No. 1067260
State Bar No. 24070299
E-mail: nmorgan@hdhtex.com

HOUSSIERE, DURANT & HOUSSIERE, LLP
1990 Post Oak Blvd., Suite 800
Houston, TX 77056-3812
Telephone: 713-626-3700
Facsimile: 713-626-3709

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 18th day of December, 2012, I filed the foregoing First Amended Complaint with the Clerk of the Court using the CM/ECF system who will send notification of such filing to the following e-mail addresses:

Clifford L. Harrison
cliff.harrison@harrisonbettis.com
Carrie Schadle
carrie.schadle@harrisonbettis.com
HARRISON, BETTIS, STAFF, McFARLANE & WEEMS, LLP
Wedge International Tower
1415 Louisiana, 37th Floor
Houston, TX 77002

Michael V. Kell
mkell@howardandhoward.com
Michael O. Fawaz
mfawaz@howardandhoward.com
HOWARD & HOWARD ATTORNEYS PLLC
450 West Fourth Street
Royal Oak, MI 48067

/s/ Neeley G. Morgan
Charles R. Houssiere, III
Neeley G. Morgan